## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**DANIEL G. BROWN,**                        :

                              **PETITIONER**      :          **CIV. NO. 3:20-cv-0119**

                                                                    **(JUDGE MANNION)**
                       **v.**                           :

**UNITED STATES DEPARTMENT,**   :
**OF HOMELAND SECURITY,** *et al.*,

                                                      :

                   **Respondents**                 :

                                                      :


## MEMORANDUM

Petitioner, a civil detainee of the United States Department of
Homeland Security ("DHS'), Immigration and Customs Enforcement ("ICE"),
housed at the Clinton County Correctional Facility ("CCCF"), McElhattan,
Pennsylvania, filed the above captioned petition for writ of habeas corpus,
pursuant to 28 U.S.C. §2241. (Doc. 1). Petitioner challenges his continued
detention by ICE, claiming that he is not removable in the foreseeable future
because Jamaica will not issue a travel document. Id.

In addition, On April 9, 2020, Petitioner filed a motion to compel
Respondents to release him, as well as a separate motion for temporary
restraining order and permanent injunction, seeking release from the Clinton
County Correctional Facility, due to the recent COVID-19 epidemic. (Docs.
14, 16). Specifically, Brown claims that he is not receiving proper treatment

for his kidney issues, which make him very highly susceptible to COVID-19 and that the CCCF "cannot adequately respond" should a COVID-19 outbreak arise. Id. For the reasons that follow, the Court will deny Brown's petition for writ of habeas corpus, Petitioner's motion to compel and Petitioner's motion for temporary restraining order.

I.    **2241 Habeas Corpus**

A. **Background**

Brown, a native and citizen of Jamaica, was first admitted to the United States on September 23, 1992, through New York, New York as a B2 non-immigrant visitor. (Doc. 13-1 at 5, Record of Deportable/Inadmissible Alien).

On April 24, 1995, Brown was convicted in the Municipal Court of Philadelphia County, Philadelphia, Pennsylvania, for the offense of Possession with Intent to Deliver a Controlled Substance and Possession of a Controlled Substance. Id. He was sentenced to one year of probation. Id.

On June 23, 1995, Brown was again convicted in the Philadelphia County of the same two charges and sentenced to 18-months' probation. Id.

On February 12, 1997, ICE encountered Brown, subsequent to an arrest by the Philadelphia Police Department for credit card fraud. Id. As a

- 2 -

result of his arrest, it was discovered that Brown had narcotics convictions and was wanted by three different agencies. Id.

On March 18, 1997, Brown was ordered removed from the United States, and on, March 31, 1997, he was removed from the United States for the first time. Id.

On February 23, 1999, Brown was arrested and charged with Conspiracy to Commit Bank Fraud. Id.

On April 18, 2001, Brown was convicted in the United States District Court for the Middle District of Pennsylvania for the offense of Conspiracy to Commit Bank Fraud and reentry after deportation. Id. He was sentenced to 51 months imprisonment. Id.

On December 13, 2001, Brown was convicted in the United States District Court for the Eastern District of Pennsylvania of Bank Fraud and sentenced to 24 months imprisonment. Id.

On December 9, 2002, Brown was convicted in the Delaware County Court of Common Please, Media, Pennsylvania, of Delivery of a Controlled Substance, stemming from a November 10, 1995 arrest. Id. He was sentenced to 9-23 months imprisonment. Id.

On August 31, 2005, Brown was removed from the United States for the second time. Id.

On May 26, 2016, Brown was convicted of Forgery-Uttering Forged Documents and sentenced to 94 days-time served. Id.

On October 6, 2017, Brown was convicted of illegal reentry and sentenced to fifty-months imprisonment. Id. at

ICE encountered Brown pursuant to the criminal alien program at Moshannon Valley Correctional Facility while serving his sentence for illegal reentry. Id.

On November 5, 2019, ICE issued Brown a Notice of Intent/Decision to Reinstate Prior Order of Removal. (Doc. 13-1 at 7, Notice of Intent/ Decision to Reinstate Prior Order of Removal).

On December 13, 2019, Brown was released from his criminal sentence into ICE custody. www.bop.gov/inmateloc.

In a decision dated March 4, 2020, ICE reviewed Brown's custody, noting that in addition to his previous two removals from the United States, and the criminal charges outlined above, Brown had been charged with Escape. (Doc. 13-1 at 8, Decision to Continue Detention). ICE also noted that on December 7, 2017, Brown had filed a petition for review and motion for stay of removal with the U.S. Court of Appeals for the 3rd Circuit but that on February 12, 2018, the 3rd Circuit denied his PFR and motion for a stay. Id. ICE determined that based on Brown's immigration and criminal history,

- 4 -

and the significant likelihood of removal in the reasonably foreseeable future, Brown would remain detained. Id.

Since his December 13, 2019 release from Federal prison, ICE has taken steps to execute the deportation order, requesting a travel document from Jamaican authorities on or about November 26, 2019, and following up on that request with representatives of the Jamaican Embassy. (Doc. 18-1 at 13, Declaration of Amanda B. Campbell, ICE Deportation Officer).

On December 16, 2019, Brown was interviewed by the Jamaican Embassy and verified as a Jamaican citizen. Id. The Jamaican Embassy indicated that due to petitioners' medical condition, they would issue a travel document for him once the Ministry of Health and Wellness ensured health care appointments and coverage for him. Id.

On April 9, 2020, ICE received word from the Jamaican Embassy that the Embassy is presently closed in keeping with the measures and guidelines imposed for the COVID-19 pandemic. Id. Embassy personnel are working remotely from home with limited access to their systems. Id. Once the Embassy resumes normal operations, they will resume accepting presentation packages, conducting consular interviews, and issuing travel documents. Id. Specifically, regarding Petitioner, the Jamaican Embassy has indicated that his medical review is still outstanding, and that the Embassy

has never informed Petitioner otherwise. Id. As a result, it is expected that the Jamaican Embassy will issue a travel document in the reasonably foreseeable future. Id.

## B. Discussion

Post-removal immigration detention is governed by 8 U.S.C. §1231(a). That section provides that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." See 8 U.S.C. §1231(a)(1)(A). During this ninety (90)-day period, "the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found ... deportable under section 1227(a)(2)." See id. §1231(a)(2). After the ninety (90)-day period expires, the alien's detention may continue, or he may be released on supervision. See id. §1231(a)(3), (6).

The Supreme Court has concluded, however, that §1231 "limits an alien's post-removal-period detention to a period reasonably necessary to bring about the alien's removal from the United States. It does not permit indefinite detention." See Zadvydas v. Davis, 533 U.S. 678, 698 (2001). Thus, "[o]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." See id. at 699. To establish a

uniform baseline, the Supreme Court concluded that a period of six (6) months is a "presumptively reasonable period of detention." <u>See</u> id. at 701. Moreover, the United States Court of Appeals for the Third Circuit has concluded that "an alien detained under §1231(a)(6) is generally entitled to a bond hearing after six months (i.e., 180 days) of custody." <u>See</u> Guerrero-Sanchez v. Warden, York Cty. Prison, 905 F.3d 208, 226 (3d Cir. 2018). Following such a hearing, the alien "is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." <u>See</u> id. at 224 (quoting Diouf v. Napolitano, 634 F.3d 1081, 1092 (9th Cir. 2011)). "The Government must meet its burden in such bond hearings by clear and convincing evidence." <u>See</u> id. at 224 n.12.

As noted *supra*, Petitioner has been detained pursuant to §1231(a)(6) since December 13, 2019. Accordingly, Petitioner's detention is within the six-month period, found presumptively reasonable by the <u>Zadvydas</u> court. <u>See</u> Rodney v. Mukasey, 340 F. App'x 761 at * 764-65 (3d Cir. 2009). As such, the length of his detention has not been unduly prolonged. Moreover, because Brown's last petition for review has been denied, he has exhausted his "administrative and judicial challenges to removal" and is "only waiting for [his] removal to be effectuated." Guerrero-Sanchez, 905 F.3d at 220.

In the interim, ICE has reviewed Brown's custody status per the requirements of 8 C.F.R. 241. ICE has determined that Brown's criminal and immigration history as well as the foreseeability of his removal warrant continued detention. In the event that Brown is still detained at the 180-day mark of post-order custody, he would be able to request the appropriate form of relief by seeking a bond hearing under Guerrero-Sanchez v. Warden York Cty. Prison, 905 F.3d 208 (3d Cir. 2018) (providing for a bond hearing for those detained under 8 U.S.C. §1231(a) for more than six months).

As for Brown's argument that his likelihood of removal is unforeseeable, his argument is premature as he has not yet met the six-month period of detention, that would trigger this inquiry under Zadvydas. Regardless, the record reveals that on December 16, 2019, Brown had an interview with the Jamaican consulate, who indicated it would issue a travel document for Brown once the Ministry of Health and Wellness ensured health care appointments and coverage for him. It is anticipated that the Jamaican Embassy will issue a travel document in the reasonably foreseeable future. Once the Jamaican Embassy issues Brown's travel document, no legal or practical barriers prevent his immediate removal. Consequently, Brown's detention is therefore lawful and his petition for writ

of habeas corpus, challenging Petitioner's ICE detention pursuant to 28 U.S.C. §2241 will be denied.

## II.   Motion to Compel Release/TRO

### A.   Jurisdiction

A habeas petition under §2241 is the proper vehicle for an inmate to challenge "the fact or length of confinement", Presser v. Rodriguez, 411 U.S. 475, 494 (1973), or the "execution" of his confinement. Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 241-42 (3d Cir. 2005). Further, the court must look to the remedy requested by the inmate to determine if she is seeking relief available in a habeas petition. "When a petitioner seeks immediate release from custody, the 'sole federal remedy' lies in habeas corpus." Camacho Lopez v. Lowe, Civil No. 3:20-563, 2020 WL 1689874 (M.D. Pa. April 7, 2020), at 8 (citing Presser, 411 U.S. at 500).

Although neither the Supreme Court nor the Third Circuit has precisely defined the circumstances in which a petitioner may challenge the conditions of his confinement through a petition for writ of habeas corpus, the Third Circuit has indicated that a challenge to the conditions of confinement is cognizable in a habeas corpus claim "in extreme cases." Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978).

Recently, Courts in this District have determined that a claim based on the COVID-19 pandemic is exactly the sort of "extreme case" contemplated in Ali. See Verma v. Doll, No. 4:20-CV-00014, 2020 WL 1814149, at *4 (M.D. Pa. Apr. 9, 2020); Camacho Lopez v. Lowe, No. 3:20-CV-00563, 2020 WL 1689874, at *5–6 (M.D. Pa. Apr. 7, 2020).

In Camacho Lopez, the petitioner was an ICE detainee subject to a final removal order whose removal was set for March 30, 2020 but, was delayed due to his COVID-19 diagnosis. The petitioner filed a §2241 habeas petition seeking immediate release from confinement based on "the threat posed by the COVID-19 viral pandemic." The respondent argued that Camacho Lopez's petition should be construed as a civil rights action under 42 U.S.C. §1983. The court found that "the extraordinary conditions of confinement" "where the petitioner tested positive for and had been hospitalized by a potentially deadly pandemic virus and claims that officials cannot properly treat him---constitute the extreme case in which habeas relief might be available." Id. at 13. The court then concluded that based on the case's unique circumstances, "both the claim brought and the remedy sought are cognizable in habeas corpus." Id. The court found, however, that Camacho Lopez's continued detention in prison was proper and dismissed his habeas petition. See also Verma v. Doll, Civil No. 4:20-14, (M.D. Pa. April

- 10 -

9, 2020) (court found petitioner, an ICE detainee, "plainly seeks a habeas remedy" where he requested immediate release from custody based on alleged "constitutionally deficient conditions of confinement that threaten his life and health" in light of the COVID-19 pandemic).

The Court agrees with its colleagues in this district who, to date, have unanimously concluded that emergency petitions for release, based on COVID19 are properly construed pursuant to 28 U.S.C. §2241. (In addition to Camacho Lopez and Verma, see also Umarbaev v. Warden, 1:20-cv-413 and Thakker v. Doll, 1:20-cv-480). Thus, this Court is in agreement with its colleagues' well-reasoned analysis and join in their conclusion that 28 U.S.C §2241 is the proper vehicle to proceed. As such, the Court finds that Brown's motion for to compel release and motion for TRO are properly brought within the instant §2241 petition for writ of habeas corpus.

## B. Background

### i. Petitioner's pre-existing condition

Daniel Brown is a forty-six year old native and citizen of Jamaica. He is currently detained pursuant to 8 U.S.C. §1231(a)(6), as he awaits his removal to Jamaica. Brown was taken into ICE custody on December 13, 2019, upon completion of is federal sentence. Brown alleges that he is

Dextrocardia Situs Inversus Total, which means that his heart is on the right side of his body and his organs are in the reverse. (Doc. 14 at 3). He does not indicate that this condition causes any inherent medical malady. His most recent medical record is a September 17, 2019 Chronic Care Treatment Plan, prepared by Moshannon Valley Correctional Center staff, which lists Petitioner's chronic diseases as Cardiac and Renal disease. (Doc. 1-1 at 4). Brown claims that "while serving the current sentence for illegal re-entry [he] developed a kidney disease and other kidney problems from possible prescribed prescription of Ranitidine pills." (Doc. 1 at 5). He believes that he is "particularly vulnerable to COVID-19" as a result of his kidney problems and that "the Clinton County Correctional Facility cannot "respond adequately" to the health risks posed by the disease and Petitioner falls[s] within the group of people with potential high risk of death of contracted the COVID-19 virus." (Doc. 14 at 5).

Brown also alleges that "at least two of [his] underlying medical conditions place [him] at serious medical risk from COVID-19 which make his immune system significantly compromised and faces imminent risk of death or serious injury in (ICE) detention if exposed to COVID-19." (Doc. 16 at 3). He claims that "whenever CCCF medical staff need to assist detainees that requires medical doctor, it have been conducted via telephone with a

doctor who is not yet hired and do not have any contractual agreement with CCCF, neither such doctor entered the CCCF, and is classified by CCCF as a Satellite Doctor." Id. Brown allege that he is "also required to obtain follow up for monitoring of his kidney including to take medication to prevent further damage or failure to his kidney. The previous medication for kidney was causing abnormality of heart beating and other heart palpitations which requires substitute medication" and "Petitioner is unable to get these substitute medications, nor see a cardiologist, nor GI doctor or follow up for monitoring of his kidney in ICE custody, even though he requested for same and experience extreme pain related to his kidney." Id.

### ii.   CCCF's COVID-19 Protocols

The Clinton County Correctional Facility ("CCCF") houses immigration detainees pursuant to contracts with ICE. Thakker v. Doll, No. 1:20-cv-0480, Doc. 15-2, Declaration of Jennifer Moon, Deputy Assistant Director for Healthcare Compliance with ICE Health Service Corps.). Direct clinical health care services at both Facilities are provided by medical staff and overseen by Field Medical Coordinators (FMCs), who work for the ICE Health Services Corps (IHSC). (Doc. 15-2, Moon Decl.). IHSC comprises a multidisciplinary workforce. Id. FMCs ensure the provision of medical care by contractors to the ICE detainees meets detention standards. Id.

Initially, it is noted that CCCF has zero confirmed cases of COVID19. (Doc. 18-1, Declaration of Joshua Reid, Assistant Field Officer Director (AFOD) for Department of Homeland Security (DHS)). ICE also has epidemiologists who have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff for the screening and management of potential exposure among detainees. Id. ICE and the IHSC also follow guidance issued by the CDC to safeguard those in its custody and care. Id.

ICE has taken affirmative steps to reduce the number of immigration detainees at CCCF by reconsidering custody determinations, and parole requests, and issuing orders of supervision on release for those aliens who are not subject to mandatory custody, do not pose a danger to the community or flight risk, and/or are not significantly likely for removal in the foreseeable future. Id. As a result, CCCF currently houses 176 combined male and female detainees, despite having capacity to house 298. Id.

In addition to reducing inmate population, officials have, temporarily, suspended social visitation and limited professional visits to non-contact visits in all detention facilities as a precautionary measure. Id. CCCF screen all staff and vendors when they enter the facility. Id. CCCF screens all detainee intakes upon entry, which includes reviewing travel and medical

history, assessing disabilities and pre-existing underlying medical conditions, and evaluating fever and respiratory illness. Id. Officials also ask detainees to confirm whether they had close contact with a person with laboratory-confirmed COVID-19 or traveled from or through areas with sustained community transmission in the past 14 days. Id. Results of these assessments dictate whether officials monitor or isolate the detainee. Id. Officials place in isolation, and test, any detainee who presents symptoms compatible with COVID-19. Id. If an isolated detainee tests positive, medical staff provides treatment. Id. In case of any clinical deterioration, officials refer the detainee to a local hospital. Id.

In cases where they know an asymptomatic detainee was exposed to COVID-19, officials place that detainee in a cohort[1] with restricted movement for the duration of the 14-day incubation period and monitor the detainee's daily for fever and symptoms of respiratory illness. Id. ICE refers to a medical provider those detainees who show onset of fever or respiratory illness. Id. Officials discontinue cohorting, once the 14-day incubation period ends with no new cases. Id. Per policy, and in accordance with CDC or state and local

_____

[1] Cohorting is an infection prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. Id.

health department guidelines, officials place in an appropriate setting any detainees diagnosed with any communicable disease and who require isolation. Id. CCCF has dedicated housing units where they quarantine suspected or confirmed COVID-19 positive patients. Id.

CCCF educates staff and detainees on COVID-19, including the importance of hand washing and hygiene, covering coughs with elbows instead of hands, and requesting sick call if they feel ill. Id. CCCF provides detainees daily access to sick calls in a clinical setting, id., and have onsite medical staff 24 hours per day, seven days per week, with the ability to admit patients to the local hospital for medical, specialty, or mental health care. Id. All detainees at CCCF have access to various media and news outlets via television. Id.

CCCF has increased sanitation frequency and provides sanitation supplies to inmates and staff. For example, CCCF provides soap, water, and hard surface disinfectant in every housing unit at the prison, and all staff are provided access to hand sanitizer. Id. The facility added 20 hand sanitizer stations throughout the facility. Id. Both detainees and staff utilize the hand sanitizer stations. Id. Transport vehicles are disinfected after each use. Id. Additional cleaning of tables, chairs, door handles, telephones, desks, remotes, railings, tablets, and microwaves in detainee housing units is being

conducted multiple times per day. Id. The medical department is being cleaned a minimum of twice per day. Id. The Law Library, receiving and discharge holding cells are cleaned and sanitized after each use. Id. Staff are instructed to sanitize equipment such as desks, telephones, keyboards, mouse, radios, etc. at the beginning of each shift and at least once during shifts. Id. The administration is encouraging both staff and the general population to use these tools often and liberally. Id.

All staff are required to wear masks when in the secure portion of the facility. Id. All detainees have been provided with a minimum of two washable masks, and are encouraged to utilize the masks, at all times. Id. CCCF now requires that transport and intake officers be properly fitted for and wear N95 masks. Id. Employees in intake and accompanying inmates outside the facility are required to wear goggles or safety glasses. Id. Upon removal of their masks, employees are required to immediately wash their hands. Id. Prison personnel are broadcasting COVID-19 information from the Pennsylvania Department of Health and Centers for Disease Control and prevention information to all detainees in multiple languages over their internal closed-circuit broadcast system. Id.

**C. Legal Standard**

- 17 -

To obtain a temporary restraining order or a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." See id. Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." Id. at 178 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." Id. at 176 (quoting Del. River Port Auth. v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." Id. at 179.

**D. Discussion**

- 18 -

### i.     **Likelihood of Success of the Merits**

Unlike convicted prisoners whose conditions of confinement claims arise under the Eighth Amendment, pretrial and immigration detainees are entitled to heightened protections. See Bell v. Wolfish, 441 U.S. 520, 535-36 (1979). Accordingly, an immigration detainee's condition of confinement claim is properly analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment. See E.D. v. Sharkey, 928 F.3d 299, 307 (3d Cir. 2019). In other words, immigration detainees must establish that their confinement falls below constitutional minimums. Id. To do so, Brown must show that the conditions of confinement at Clinton County Prison amount to "punishment" lacking any reasonable relationship to "a legitimate governmental objective." Bell v. Wolfish, 441 U.S. 520, 535, 539 (1979). He cannot.

To the extent that Brown challenges his conditions of confinement with the conclusory argument that his confinement in CCCF amount to punishment because the Facility "has not implemented proper measures to prevent the spread of COVID-19 in the facility and it cannot because CCCF space is inadequate," (Doc. 14 at 4), the record demonstrates otherwise.

Initially, the Court notes that as of this writing, there are no confirmed cases of COVID-19 at CCCF. Furthermore, Respondent has submitted

declarations establishing that the prison has taken reasonable steps in response to the COVID-19 pandemic to minimize the virus' spread and maintain sanitary prison conditions. Given these preventive measures, the Court finds that CCCF has more than adequately addressed Brown's concerns regarding CCCF's efforts to prevent the spread of COVID-19. As such, the Court cannot conclude that Plaintiff is being unconstitutionally "punished" by remaining in detention.

It is not enough for a Petitioner to allege that he is detained and presented with a risk of contracting COVID-19 that is common to all prisoners. As the Third Circuit has noted in the analogous context of motions for compassionate release under 18 U.S.C. §3582, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." United States v. Raia, __ F.3d __, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

Brown's claim also fails to the extent he attempts to raise a deliberate indifference conditions-of-confinement claim sounding in Eighth Amendment doctrines but, rooted in the Due Process Clause. See Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993) (finding that when it comes to medical care

and medical conditions, the "deliberate indifference" standard applies in both the due process and Eighth Amendment contexts).

As it relates to medical claims, the Third Circuit "has set forth the elements of a Due Process Clause violation based on the government's duty to provide pretrial detainees with appropriate medical care: Such a violation requires 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Boring v. Kozakiewicz, 833 F.2d 468, 471 (3d Cir. 1987). In the prison context, the Supreme Court has defined deliberate indifference as existing only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the interference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The standard is lower for detainees, who must show that the detaining official knew or should have known of, and consciously disregarded, the claimed risk. See Woloszyn v. County of Lawrence, 396 F.3d 314, 320-21 (3d Cir. 2005) (citations omitted).

Brown alleges that "at least two of [his] underlying medical conditions place [him] at serious medical risk from COVID-19 which make his immune system significantly compromised and faces imminent risk of death or

- 21 -

serious injury in (ICE) detention if exposed to COVID-19".[2] (Doc. 16 at 3). Believing that CCCF has failed to take adequate steps to protect him and to prevent the spread of COVID-19, he believes that he is entitled to release. The Court finds the record before them belies Petitioner's contention.

Here, accepting the grave risk of contracting COVID-19, Respondent has undertaken numerous measures to combat the spread of COVID-19 and prevent detainees from contracting the illness. Respondent has implemented protocols that are consistent with the guidance set forth by the CDC for Correctional and Detention Facilities, and CCCF is being supervised by an ICE Field Medical Coordinator, as well as ICE epidemiologists who are monitoring the outbreak and continuously updating infection prevention and control protocols for facilities. These actions do not demonstrate that prison officials have recklessly disregarded the substantial risk of harm that COVID-

---

[2] To the extent that Brown claims he has received constitutionally deficient medical treatment with respect to his underlying conditions, he must show that (1) he has a serious medical need and (2) that acts or omissions of detaining officials "indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). Petitioner's claim is without merit, as Brown has not shown that officials have disregarded an underlying medical condition related to COVID-19 or neglected to offer appropriate treatment.

19 poses. Rather, these actions indicate that Respondent is actively taking significant steps to try and prevent detainees from contracting COVID-19. While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondent's conduct simply does not demonstrate a deliberate indifference to the current global pandemic. Accordingly, Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim.

### ii.   **Irreparable Harm**

The second threshold showing Petitioner must make in order to be granted a TRO is that he is "more likely than not" to suffer irreparable harm if a temporary restraining order is not granted. Reilly, 858 F.3d at 179. Irreparable harm is injury of such an irreversible character that prospective judgment would be inadequate to make the movant whole. See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). Mere risk of injury is not enough. Rather, the moving party must establish that the claimed harm is imminent and probable. Anderson, 125 F.3d at 164. The requirements of irreparable harm and likelihood of success on the merits are correlative: that is, the weaker the merits showing, the more will be required on the showing of irreparable harm, and vice versa. See Reilly, 858 F.3d at 179 (quoting

Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

To establish irreparable harm, Brown claims that he will suffer irreversible injury because he is "uniquely vulnerable to COVID-19." (Doc. 16 at 10). While, the Court acknowledges Brown's susceptibility to complications should he contract COVID-19, the Court, again, notes that Brown is housed in a facility with no confirmed cases of COVID-19. Thus, that alone, reduces the imminence of Brown's claim. Nor has Brown submitted any evidence to suggest that he will be safer if he were released from ICE custody. Consequently, Brown has failed to show he is "more likely than not" to suffer imminent and irreparable harm if he remains in detention. Reilly, 858 F.3d at 179.

### iii.   **Balancing of Equities**

Because the "gateway factors" have not been satisfied, the Court need only briefly discuss the possibility of harm to the nonmovant and the public interest. Id. at 176, 179.

It is well-settled that the public interest in enforcement of United States immigration laws is significant. United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976); Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public

- 24 -

interest in enforcement of the immigration laws is significant."); see also Nken v. Holder, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Brown's criminal convictions for bank fraud, delivery of a controlled substance, forgery, and two illegal re-entries has resulted in his current order of removal and continued detention. Respondent and the public have an interest in enforcement of removal orders, see Nken, 556 U.S. at 436, and Brown's continued detention furthers that interest. The continued legal detention of Brown also isolates him from society at large, while allowing him to receive appropriate medical care free of charge. Accordingly, Brown's continued detention serves the interests of all involved, Petitioner, Respondent and the public. Such alignment of interests supports the denial of a temporary restraining order.

### III.  Conclusion

Based on the foregoing reasons, Brown's petition for writ of habeas corpus, filed pursuant to 28 U.S.C. §2241, and challenging to his continued detention pursuant to 8 U.S.C. §1231(a)(6), is denied. Brown's motions to

compel release and for temporary restraining order, filed within the instant petition for writ of habeas corpus, are denied. An appropriate Order follows.


*s/ Malachy E. Mannion*
MALACHY E. MANNION
United States District Judge

Dated: April 20, 2020
20-0119-01